THE UNION DEPOT COMPANY, *Appellant*, v. THE CHICAGO, KANSAS & NEBRASKA RAILWAY COMPANY *et al.*

Division One, December 22, 1892.

1. **Contract**: RAILROAD: USE OF DEPOT. Six railroad companies whose lines terminated at Kansas City, and another company whose line ran through that place, made a contract with a union depot company whereby each of said companies agreed to use such depot and to pay as rent therefor one seventh of the expense of operating the depot, and one seventh of the interest on the cost of the depot. The contract further provided that any rents received by the depot company from other roads should be credited upon the rent reserved in the contract. One of the parties to the contract, whose road terminated at Kansas City, extended its line through that place by purchasing the line of another company not a party to the contract and which had been paying rent to the depot company for the temporary use of the depot. *Held*, that said purchasing company was entitled to use the depot for its original and its purchased line upon payment only of the rental imposed on it by the contract.

2. ———: ———: ———. The evidence in the case examined and *held*, that, under the agreement between the depot company and the purchased line, the latter had only a temporary right to use the depot and not a lease from year to year.

*Appeal from Jackson Circuit Court.*—HON. JOHN W. HENRY, Judge.

AFFIRMED.

*Watson J. Ferry* and *Frank Hagerman* for appellant.

(1) The court below erred in directing a verdict for defendants, because the contract should not have been construed so as to authorize the Rock Island company, without the payment of rent, to use the depot for the trains of the Nebraska company, an independent rent-paying line. (2) In any event, there was liability for the rent of 1889, because the resolutions of the board of directors of the depot company were known to and acted upon by defendants, and, therefore, a contract was entered into which was not terminable by notice upon April 30, 1889. Hence the court erred in directing the verdict for defendants. (3) The court should ascertain, if possible, the intention of the parties and construe the contract according to its sense, giving weight to all its terms, even though the literal language cannot be followed. 2 Kent's Commentaries [12 Ed.] sec. 555; Bishop on Contracts [Enlarged Ed.] secs. 256, 380; Plowden's Commentaries, 467. From all the facts it is clear that the court below erroneously followed the words instead of the sense of the contract, and ignored the intention of the parties. (4) The implied portion of a contract is of as much force as the express parts. Bishop on Contracts [Enlarged Ed.] sec. 241; *Whincup v. Hughes*, Law Rep. 6 C. P. 84; *Long v. Strauss*, 107 Ind. 94; *Rogers v. Kneeland*, 13 Wend. 114; *Jones v. Fisher*, 116 Ill. 68; *Black v. Woodrow*, 39 Md. 194; *McCartney v. Glassford*, 20 Pac. Rep. (Wash.) 423; *United States v. Speed*, 8 Wall. 57. And, if an act to be done by one party can only be done upon a corresponding act being done or allowed by the other party, an obligation of the latter to do or allow to be done the act or thing necessary to the completion of the contract will be necessarily implied. *Black v. Woodrow*, 39 Md.

194; *McCartney v. Glassford*, 20 Pac. Rep. (Wash.) 423; *United States v. Speed*, 8 Wall. 57. In this case the contract required the depot company to collect rent of the Nebraska company, and the implied obligation of the contract required the Rock Island company to permit this to be done. The construction adopted below permitted this implied obligation to be violated, thereby ignoring a rule of construction: That, if a contract is susceptible of two constructions, that one should be adopted which stands with the right, and would prevent a breach of contract or any illegal act or any undue advantage. *Noonan v. Bradly*, 9 Wall. 394, 405; 2 Wharton on Contracts, sec. 654; Bishop on Contracts [Enlarged Ed.] sec. 392. (5) The right of the Rock Island company to run its trains was limited to the trains using the particular road in existence and entering the depot at the time of the execution of the contract, because the right was one given, not personal to corporations, but incident to the line of road. 2 Devlin on Deeds, sec. 940; *Lydick v. Railroad*, 17 W. Va. 427; *Railroad v. Reeves*, 64 Ga. 492.

*McDougal & Sebree* and *Gardiner Lathrop* for respondents.

(1) The Rock Island company, having purchased the railroad and trains of cars which formerly belonged to the Nebraska company, had the right, under the contract of the railroad companies with the depot company, to use the union depot for these as well as all its other passenger trains. (2) This contract is plain and unambiguous, and the intention of the parties must be gathered from the contract itself. Bishop on Contracts, 379; Sedgwick on Construction of Statutory Law, 191; *Rosely v. Mattingly*, 14 B. Mon. 89; *Fisher v. Blight*, 2 Cranch, 358, 399; *Aldrich v. Williams*, 3 How.

U S. 24.. (3) Parties are bound by the terms of their contract when the terms are clear and unambiguous, and courts will not adopt a construction of an instrument which would do violence to the rules of language, or interpolate something not stipulated by the parties. *Dermott v. Jones*, 2 Wall. 1; *Fruin v. Railroad*, 89 Mo. 397; *Michell v. Ins. Co.*, 17 Mo. App. 23; *Kimball v. Brawner*, 47 Mo. 399; *Edrich's Case*, 5 Co. 118; *Jones v. Harrison*, 6 Exch. 328; *Weller v. Harris*, 20 Wend. 556. (4) The language of the contract is that the union depot shall be used by the railroad companies for all their passenger trains destined for or departing from Kansas City. When read in the ordinary popular sense, as it should be, this language is broad enough to cover all passenger trains of any of the companies. Bishop on Contracts, 366; *Renshaw v. Ins. Co.*, 103 Mo. 595. (5) The contract grants the Rock Island company the use of the union depot for all its passenger trains, without limitation upon the direction from which they come or go. The depot company will be presumed to have known that within fifty years, the time of the contract, the Rock Island company would grow and extend its lines and business. *Renshaw v. Ins. Co.*, 103 Mo., 595, 604; *Railroad v. Railroad*, 47 Fed. Rep. 15. (6) But, if the language of the contract be considered in connection with the surroundings of the parties at the time it was made, together with the acts of the parties under it, still there can be but one reasonable, natural conclusion of its meaning arrived at, and that is, that the railroad companies had the right, and it was their duty, to use the union depot for all their passenger trains arriving at or departing from Kansas City. (7) The respondents are not liable to appellant on account of any arrangement of the Nebraska company with the depot company for the use

of the depot property. · Such' arrangement amounted to nothing more than a license, and was terminated in April, 1889. Tiedeman on Real Property, sec. 652; Redder·v. Brown, 20 Ala. 412; Doe. v. Baker, 4 Dev. (Law), 220; Desloge v. Pearce, 38 Mo. 558; Boone v. Stover, 66 Mo. 430; Hammon v. Douglass, 50 Mo. 434. (8) The Nebraska company did not use the union depot in any way whatever during the months in controversy. The trains which the Rock Island company ran into and from said depot from and to the west were the trains of the Rock Island company; and the Rock Island company having paid its bills to the depot company for the use of said depot during said months, no cause of action exists in favor of the depot company against either of the respondents.

BLACK, J.—At the close of the evidence plaintiff took a compulsory nonsuit, which the circuit court refused to set aside, and hence this appeal.

The plaintiff is a corporation owning and operating at Kansas City a depot with the necessary buildings, sheds, tracks and offices, all designed to accommodate the different railroads at that place. The depot company brought this suit against the Chicago, Kansas & Nebraska Railway Company, hereafter called the Nebraska company, and against the Chicago, Rock Island & Pacific Railway Company, hereafter called the Rock Island company, to recover rents for the months of May to October, 1889, both inclusive amounting to some $6,700. The petition avers that the rents sued for were due for the use of the depot by the trains of the Nebraska company, which trains it is alleged were operated by the Rock Island company. The defendants say that the trains alleged to be the trains of the Nebraska company were in fact the trains of the Rock Island company, and that the latter company had a

contract with the depot company by which it had the right to use the depot for all of its trains for one rental and that it had paid this rental for the months named in the petition, and so the circuit court held.

The question whether the Rock Island company was under any obligation to pay more than one rental depends upon the construction of the contract.

In 1876 there were six railroad companies whose roads terminated at Kansas City. Besides these roads the road of the Missouri Pacific Railway company extended from St. Louis to Kansas City and thence on west to Atchison in the state of Kansas. The union depot company, as party of the first part, and these seven companies, as parties of the second part, entered into a written contract, dated the first of June, 1876. As this contract is lengthy, we shall state the substance of it, quoting those parts deemed most material. It begins by saying that, whereas the respective railroads of the parties of the second part "terminate at or run into and through Kansas City," and to prevent expense and avoid the accumulation of separate stations, a necessity has arisen for a union depot; and, whereas the union depot company has become incorporated for the purpose of maintaining such a depot "of sufficient capacity to accommodate the trains of the railroads of the second parties," and the second parties have agreed to occupy and rent the same when completed; "and, whereas, for the protection of the parties hereto it is important that the rights, duties and liabilities of each in regard to the whole subject of said depot, its appurtenances, use, care, control, rental, taxes, expenses, renewals and repairs shall be stated and defined," it is agreed as follows, each of said railroad companies acting for itself and independently:

The first and second clauses make it the duty of the depot company to acquire the necessary land and

to erect depot buildings, sheds, track, etc., the character and cost of the buildings to be subject to a govern-·ing board.   The third clause provides: "Said several railroad companies, party of the second part hereto, agree to pay to said party of the first part for the use of said depot an annual rental amounting to ten (10) per cent. interest on the total ascertained outlay for actual cost of said depot, including grounds, build-ings, tracks, siding, switching yards, connections, and all needful appurtenances, and in addition thereto the expenses of maintaining and operating the same, and of all repairs thereto, and all taxes."   The rental to be paid by any one company is not to exceed a designated amount per annum, and the total outlay is not to exceed a named sum, except with the written consent of the several railroad companies.   "And provided further that all rentals for use of said depot and appurtenances derived from railroad companies not parties hereto, and all rentals and receipts for said depot or appurtenances from any source whatever, shall be applied as a credit upon and in reduction of the amount so, as aforesaid, to be paid as rental by the several railroad companies parties hereto."

The ninth clause provides: "The union depot shall be used by said railroad companies, parties hereto, for all their passenger trains destined for or departing from Kansas City, and all railroad companies using said depot shall run their passenger trains to and from said depot, unless otherwise expressly permitted by said governing board."

The contract contains many other stipulations, some of them to the effect that the amount of rentals to be paid by railroad companies, not parties to the con-tract, shall be subject to the governing board; that the rentals to be paid by the parties to the contract shall be paid monthly; and that the persons consti-

tuting the governing board shall be appointed by the railroad companies, one by each company; that the railroad companies shall have the right, at any time after fifteen years, to purchase the depot property at the cost thereof; and the covenants, conditions and stipulations set out in the contract are made binding upon the parties thereto, their successors and assigns for fifty years from and after the depot shall be completed and ready for occupancy. Other provisions are made in respect of insurance and the appointment of depot officers, and the contract concludes with the stipulation that all of the covenants on the part of the parties of the second part are several, not joint, and in no event shall one railroad company be liable for any default of the others, or for more than its one seventh of the amount agreed to be paid to the first party.

The defendant, the Rock Island company, became a party to this contract in 1880. Two other railroad companies were also admitted as parties thereto, one prior and the other subsequent to 1880, thus making ten parties of the second part. These ten companies all have the same rights, and the only effect of admiting these three companies was to lessen the rental to be paid by each company from one seventh to one tenth of the whole rental.

The defendants, the Nebraska company and the Chicago, Santa Fe & California Railway company, were the only railroad companies, not being parties to the depot contract, which ever entered and used this union depot.

The governing board mentioned in the contract was organized in this way: Each railroad company, as it became a party to the contract, took an amount of issued stock equal to that taken by each of the other companies, and thus as stockholder had a right in the

selection of directors. Each railroad company elected one member of the board of directors, and this board acted as the governing board.

When the defendant, the Rock Island company, became a party to the agreement, it owned and operated. a road from Chicago in Illinois to Cameron in this state. It had acquired the right to run its trains from Cameron west to Kansas City over the road of the Hannibal & St. Joseph Railroad Company, but it did not then, nor does it now, own a track of its own between these points. The Hannibal company was one of the original parties to the contract.

The defendant, the Nebraska company, owned and operated a line west of Kansas City, extending from Topeka, in the state of Kansas, west through that state and into Colorado. It owned no road from Topeka east to Kansas City, but had acquired a right to run its trains between Topeka and Kansas City over the road of the Union Pacific Company, which was also one of the original parties to the contract before mentioned. This right or lease from the Union Pacific Company did not give the Nebraska company the right to use the depot at Kansas City. In May, 1886, the Nebraska company leased its road, including the right over the Union Pacific road, to the St. Joseph & Iowa Railroad .company, for a period of nine hundred and ninety-nine years, and it seems this last-named company then took possession of the property so acquired and operated the road so leased by it. The Nebraska company and the St. Joseph & Iowa company, hereafter called the Iowa company, were never admitted as parties to the depot.contract, but it seems the president of the Nebraska company made a temporary arrangement with the depot company, whereby it and its lessee, the Iowa company, used the depot for a specified monthly rental. This rental was paid, some-

times by one of these companies and sometimes by the other, down to the first of May, 1889. Prior to the last-named date, that is to say, on the first of January, 1889, the Iowa company sold and transferred its property, including the right of way over the road of the Union Pacific company from Topeka to Kansas City, to the defendant, the Rock Island company. That company took possession of the property so purchased, and thereafter ran its trains from the east to Kansas City, and thence on west over this newly purchased line through Kansas and Colorado. The Rock Island company gave the depot company notice that the rents before paid by the Nebraska company would cease on the thirtieth of April, 1889. The claim of the Rock Island company is, that it has the right, under the contract with the depot company, to use the depot for its western, as well as for its eastern trains for the one rental.

Other evidence was received for the purpose of showing the construction given to the contract by the parties thereto. The road of the Missouri Pacific company, one of the original parties to the contract, was less than four hundred miles in length at the date of the contract, but at the date of the trial that road had been extended so that it was from three to four thousand miles in length. That company transacts about twenty-six per cent. of the business transacted at the depot. It pays no more rental than each of the other companies parties to the contract. The Kansas City, Fort Scott & Gulf Railroad has extended its line from less than two hundred miles to over five hundred. It takes the trains and cars of the Missouri, Kansas & Texas Railroad Company at Paola, in the state of Kansas, and hauls them to the depot at Kansas City, but pays no extra charge for the use of the depot. There is much other evidence of a like character.

I. The evidence shows beyond all question that these trains, alleged in the petition to have been the trains of the Nebraska company, were in point of fact trains owned and run by the Rock Island company. When the Rock Island company became a party to the depot contract in 1880, its line terminated at the Kansas City depot. But by the purchase of the Nebraska company property, its line was extended on westward through the state of Kansas and into the state of Colorado. The question, therefore, is whether it has the right, under the depot contract, to the use of the depot for its trains now passing through Kansas City for the one rental. In other words, has it the right to the use of the depot for all of its passenger trains, eastern and western, for the one rental. That it has such right we think is clear.

By looking to this depot contract we see the depot company agrees to procure the land and erect the proper structures for a depot sufficient to accommodate the business of the roads of the companies parties thereto; and on the other hand the railroad companies parties thereto agree to use the depot for all of their passenger trains destined for or departing from Kansas City, unless otherwise expressly permitted by the governing board. The chief object of the contract is to bring the trains of the various roads to one common station, and thereby avoid the expense and delays incident to a number of depots, and to faciliate the transfer of passengers from one line to another. The subject-matter, and the entire subject-matter, of this contract is the proposed common depot; and as to this subject-matter the contract professes to and does fix the rights, duties and liabilities of all parties thereto with detail and precision. The contract leaves each and all of the railroad companies free to extend their lines in any direction they may see fit. It is true that

at the date of the original contract but one road of the several companies, parties to the contract, passed through and beyond Kansas City; but we are unable to find a single covenant which undertakes or seeks to make Kansas City a continued terminal point of any of the several roads. This is a subject as to which the contract does not deal. The railroad companies are left entirely free to extend their lines as they see fit and in any direction that they may deem to their interest. This is still the more apparent when we see that the compensation to be paid by each railroad company to the depot company for the use of the depot does not depend in the least upon the mileage of such road or the amount of business which it transacts at the depot. Each company is left to extend its road and increase its business without additional charge. It matters not whether we look to the face of the contract or the construction placed upon it by the parties themselves. The result is the same, and that is this, that each railroad company, party to the contract, must pay the same amount for the use of the depot, without any regard whatever to the mileage of such road or to the amount of business transacted by it at this depot. The Rock Island company had the unrestricted right to extend its road through and beyond Kansas City, and the mere fact that it did do so does not make it liable for any additional depot charges.

But it is argued that it is against the spirit and intent of the contract to allow the Rock Island company, a party to the depot contract, to buy up an independent rent-paying line, and in this way deprive the depot company of the rents which it would otherwise receive, and at the same time deprive the railroad companies, parties to the contract, of the rents to which they are entitled under the contract. If the Rock Island company had purchased a road belonging

to another company, a party to the contract, the depot company would not lose the rental which the selling party had agreed to pay.   And this is true whether we regard the contract of the selling company with the depot company as one running with the land in favor of the depot company or not.   The sale of the road belonging to one company to another company, both being parties to the depot contract, would and could not affect the contract rights of the depot company. So too the depot company would not be deprived of any contract rights which it had with the Nebraska company at the time that company sold its property to the Rock Island company.   But the evidence does not show that the Nebraska company or the Iowa company had made any contract with the depot company for the use of the depot for any defined time.   The Nebraska company had applied for membership in the depot company, but the application had been postponed, and it had nothing more than a mere temporary permission to use the depot.   It and its lessees, the Iowa company, were under no obligation to any one to haul their cars into the union depot.   They could discontinue the use of this depot at any time, construct and use a depot of their own.

We do not question or controvert the proposition that the real intention of the parties to a contract should control the letter, and the strict letter may be abridged or enlarged so as to give effect to the intention of the parties as gathered from the whole instrument, and the contract may be read in the light of the circumstances under which it was executed.   So too the law often implies duties and obligations from those which are expressed, and the implied duties and obligations are as much a part of the contract as those which are expressed.   Bishop on Contracts [Enlarged Ed.]
VOL. 113—15

sec. 241. But we cannot see that there is any implied duty on the part of the Rock Island company inconsistent with a right on its part to extend its line by the purchase of the Nebraska company property; for the Nebraska company was under no contract or other obligation to the depot company or any of the railroad companies, parties to the depot contract, to use the depot or pay rent for such use. As before said the Nebraska company and its lessee, the Iowa company, had a right, as against the depot company and the railroad companies parties to the depot contract, to quit the use of the depot at any time, and to construct and use their own depot or station house. The Rock Island company having purchased the Nebraska company property, the trains on this newly acquired extension became the trains of the Rock Island company for all purposes, and the Rock Island company is bound by the terms of its contract with the depot company to haul these trains into the common depot, and it has the right to the use of the depot for all of its trains, eastern and western, for the payment of the one rental.

2. Thus far we have assumed that the arrangement made by the Nebraska company for the use of the depot was a temporary use. But it is further insisted that there was at least an annual renting, so that the defendants are liable in any event for rents for the year commencing the nineteenth of April, 1889.

To an understanding of this issue it is necessary to state more in detail the evidence relating thereto. The Nebraska company, by its president, made application for admission to the depot contract in August, 1887. This application and that of three other companies were considered by the board of directors of the depot company in October of that year, and the applications were all deferred, and of this action the Nebraska

company was duly notified. About this date the Nebraska company made a temporary arrangement with the president of the depot company, whereby the former had the right to use the depot. The directors of the depot company passed the following resolutions at the following dates:

" JANUARY 10, 1888.

" On motion, duly seconded, the action of the president in causing the Chicago, Kansas & Nebraska Railway Company to be billed for rent of depot and track privileges on the basis of one eleventh of eight per cent. per annum on the cost of the property, and one eleventh of operating expenses, taking an average of the last four years' expenses, was approved as a temporary arrangement."

" APRIL 19, 1888.

" That the Chicago, Santa Fe & California Railway Company and the Chicago, Kansas & Nebraska Railway Company be admitted as tenants to the use of the union depot company's depot and tracks for an annual rental based on eight per cent. of the cost of the property and one twelfth (1-12) of the operating expenses under average established during the last four years."

" JANUARY 8, 1889.

" That the Chicago, Santa Fe & California Railway Company and the Chicago, Kansas & Nebraska Railway Company be charged a rental each of one twelfth of eight per cent. of the cost of the property and with one twelfth of the current expenses and taxes from January 1, 1889."

The Nebraska company did not, at any time, run its trains into the depot, but they were run in by its lessee, the Iowa company, under the said resolutions. There is evidence to the effect that the Depot company supposed they were the trains of the Nebraska

company. Monthly *rent bills* were made out according to the resolutions and forwarded to the Nebraska company at Topeka. They were paid by the Iowa company down to January, 1889. After that they were paid by the Nebraska company down to the first of May, 1889. That company then declined to pay them. Notice was given on the thirtieth of April, 1889, that the payment of these rent bills would cease with that month. This notice came from the Rock Island company which had purchased this Nebraska company line about the first of that year.

We think there is evidence from which the jury could find that the Nebraska company and the Rock Island company had full notice of all these resolutions passed by the directors of the Depot company, and we must, therefore, take it as a fact that they did have such notice. Now, the resolution of January 10, 1888, did nothing more than approve the temporary arrangement by the Nebraska company with the president of the Depot company. Thus far there is nothing but simply a license given to the Nebraska company to use the depot temporarily. Indeed, nothing more is claimed for this resolution.

But the plaintiff does claim that the resolution of April 19, 1888, and the payment of rent thereunder, changed the temporary license to an agreement running from year to year until one party ended it at the close of a year; that, as the first year ended the nineteenth of April, 1889, and no notice of an intention to quit paying rents was given until the thirtieth of that month, the new year began and must run to April 19, 1890.

This resolution of April 19, 1888, standing alone, might perhaps lead to such a conclusion. But this resolution must be read in the light of what preceded and followed it. In the first place the Depot company

still had pending before it the application of the Nebraska company to be admitted as a party to the depot contract. In the next place this resolution, taken alone and literally, demands no more than annual payment of rents, while the evidence shows that rents were in fact demanded and paid monthly. This resolution does not state clearly what part of the eight per centum on the cost of the property the two named companies are to pay. Its purpose seems to have been to change the rent from one eleventh to one twelfth by reason of the fact that the Chicago, Santa Fe & California company was then also allowed to use the depot.

Again, the directors of the Depot company could not have regarded this resolution as fixing the rent from year to year, for before the expiration of the first year they passed the resolution of January 8, 1889, fixing the rent on a different basis, namely, one twelfth of eight per cent. of the cost of the property with one twelfth of current expenses and taxes from January 1, 1889. This resolution says nothing about an annual rental. It was under this resolution that the rent was thereafter paid. It is our opinion that these resolutions were designed to do no more than declare the basis on which the monthly rent bills were to be, and in fact were, made out. The payment of rent under them did not have the effect to create a contract running from year to year. With this result it is not necessary to go over the other arguments made by the defendants on this branch of the case.

The judgment is affirmed. All concur.